UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS

| | |
|---|---|
| KRISTINE HOLMES, individually as surviving mother and heir at law of ELIJAH HOLMES, deceased, <br><br> Plaintiff, <br><br> v. <br><br> KELLER KRUG, <br><br> Defendant. | ) <br> ) <br> ) <br> ) <br> ) <br> ) Case No. 16-1080-EFM-KGG <br> ) <br> ) <br> ) <br> ) <br> ) |

**PLAINTIFF'S RESPONSE IN OPPOSITION TO DEFENDANT'S
MOTION TO STRIKE PLAINTIFF'S EXPERT, STEPHANIE WICK, PH.D**

This is Plaintiff Kristine Holmes' ("Plaintiff") Response to Defendant Keller Krug's ("Defendant") Motion to Strike Plaintiff's Expert Stephanie Wick, Ph.D. (Dkt. 17).

**I.   Response to statement of facts.**

Plaintiff has no objection or dispute with the "Procedural Facts" set forth in Defendant's Motion.

**II.  Plaintiff's statement of facts.**

In support of this Response, Plaintiff states:

1. Stephanie Wick, Ph.D. ("Dr. Wick") is a clinical marriage and family and addiction therapist licensed by the Kansas Behavioral Sciences Regulatory Board. (Ex. 1, Dr. Wick Dep., at 15:6-19).

2. To maintain her license, Dr. Wick takes 40 hours of continuing education in marriage and family therapy. (*Id.* at 18:1-8).

3. Dr. Wick obtained her credentials and licenses after completing an undergraduate degree, a Master's Degree in marriage and family (requiring 60 hours of credit), and a Ph.D. in marriage

1

and family therapy (obtained through full-time enrollment as a graduate student from 2006 to December 2010).  (*Id.* at 5:15 – 7:14).

4. While enrolled in her Ph.D. program (i.e., from approximately January 2006 to January 2011), Dr. Wick worked as a therapist for Andrews and Associates in Manhattan, Kansas and through her church.  Dr. Wick provided a range of services with these two entities, including therapy related to grief, loss, and family functioning.  During this time, Dr. Wick was also the program director for the KSU Institute for the Health and Security of Military Families, the focus of which was to develop programs for military families.  (*Id.* at 8:19 – 9:7; 11:7 – 12:19).

5. In January 2011, Dr. Wick started working for the army substance abuse program based in Ft. Riley.  Her practice focused on drug and alcohol dependency, but also involved therapy for other issues, including mood disorders and relationship problems.  She also evaluates and performs clinical assessments of patients.  (*Id.* at 12:20– 13:19; Dkt. 17-2, Dr. Wick CV, at 1).

6. While working for the army substance abuse program, Dr. Wick has remained on part-time status with Andrews and Associates, where she provides grief, loss, and family therapy.  (*Id.* at 13:20 – 14:11).

7. Dr. Wick serves as a consultant in civil wrongful death cases, where her focus is to analyze the surviving family members and make an assessment of the decedent's value to the family, particularly in context of analyzing the value of the loss of the decedent's care, services, and guidance (i.e., *Wentling* damages).  (*Id.* at 19:5-16; 21:2-16; 23:14 – 25:1; 26:17 – 28:11).

8. Dr. Wick relies on her education, training, skill, and experience as a marriage and family therapist when drafting a report, including multiple studies related to death, dying, bereavement, and family systems that she has read over her years of education and training. (*Id.* at 37:13 – 39:13; 62:5 – 63:19).

9. To prepare her report in this case, Dr. Wick met with Plaintiff over approximately three or four hours and interviewed her about the Holmes family structure. In the interview, Dr. Wick obtained the names of other family or friends (specifically, Brad Holmes, Taylor Bayley, Linda Lyle, Jared Lyle, and Connie Mayberry) who had knowledge of Elijah's relationship with his family. She then conducted interviews with those individuals. (*Id.* at 42:13 – 43:19; 60:15-25; Wick Report, at 1).

10. Dr. Wick concluded that the Holmes family was notable for its intense bonds and exceptional levels of cohesiveness, shared values, and reciprocal support. (*Id.* at 65:3 – 66:19; *e.g.* Wick Report, at 2-3).

11. She further noted that Elijah provided an unusual level of support and companionship to Plaintiff, which was notable for its contrast with most teenage boys Elijah's age, who are more prone to pulling away from their parents. (*Id.* at 66:2 – 67:7).

12. Elijah also was notable for his connection, encouragement and affection to Plaintiff, with a prominent example being his habit of holding his mother's hand while they were driving. Dr. Wick further noted that Elijah was in frequent communication with his mother and would call or text her daily. (*Id.* at 69:11 – 70:12; 73:18-24).

13. Dr. Wick interviewed Plaintiff in January 2015, and her deposition was completed in January 2016. (*Id.* at 45:15-19).

### III. Argument and authorities.

#### a. The failure to provide a statement of fees or list of cases in which Dr. Wick testified is harmless error.

Defendant's first argument is that Dr. Wick should be struck as a witness because, in contravention of Fed. R. Civ. P. 26(a)(2)(B), Plaintiff failed to provide (1) a list of all cases in which Dr. Wick has testified in the last 4 years, and (2) a statement of the compensation paid to

3

Dr. Wick in this case.  Defendant fails to note, however, the procedural history of this case.  Namely, this case was relatively recently moved to federal court—suit was initially filed in the District Court of Rooks County, Kansas, and the vast majority of discovery was accomplished there, including the initial disclosure of expert witnesses.  Thus, when Plaintiff first disclosed Dr. Wick as an expert, it did so under Kansas rules of civil procedure found at K.S.A. 60-226, which don't impose a requirement upon Kansas litigants to disclose a four-year case list or a compensation statement.  When this case was moved to federal court, Plaintiff produced an updated expert disclosure to Defendant and advised Defendant's counsel that a case list and compensation statement had been requested.  A case list is being produced to Defendant in connection with this Response.

    Putting aside the procedural history of this case, Defendant's argument that Dr. Wick should be struck as an expert fails due to Defendant's failure to comply with D. Kan. Local Rule 37.2.  Under Local Rule 37.2, a party that has a "discovery or disclosure dispute[] must describe with particularity the steps taken" to resolve the dispute, and must make "a reasonable effort to confer with opposing counsel concerning the matter in dispute" before filing a motion related to the dispute.  Here, Defendant has not fulfilled this obligation.  Defendant's counsel never mailed or faxed a letter to Plaintiff's counsel regarding the nonproduction of Dr. Wick's fee schedule or billing statement, nor did it make a good faith effort to "converse, confer, compare views, consult, and deliberate" with Plaintiff's counsel on the topic.  Plaintiff's counsel and Defendant's counsel conferred about a number of issues in this case, including the scheduling of depositions, the dismissal of the state court action and refiling in federal court, and the selection of the mediator.  Yet defense counsel never reached out and voiced any displeasure about the case list and billing statement, and instead waited to raise the issue in the Motion to Strike.  What's more, despite

noting that a failure to produce expert materials may be excused if "the failure was . . . harmless" (*see* Fed. R. Civ. P. 37(c)(1)), Defendant makes no argument that the nonproduction of Dr. Wick's case list and billing statements has caused any harm. *See* Dkt. 17, at 3. In light of Defendant's failure to comply with Local Rule 37.2 and his failure to show prejudice of any sort, Defendant's argument should be rejected.

### b. Dr. Wick meets the standards necessary to provide expert testimony in this case.

Plaintiff does not dispute the majority of Defendant's description of the law relevant to the admissibility of expert testimony. *See* Motion, Dkt. 17, at 3-4 (discussing *Daubert*, *Kumho Tire*, Fed. R. Evid. 702, etc.). But it should be noted that even in the aftermath of *Daubert* and its subsequent cases, "the rejection of expert testimony is the exception rather than the rule." Fed. R. Evid. 702, Adv. Comm. Notes (2000). *Daubert* did not work a " 'seachange over federal evidence law,' " and " 'the trial court's role as gatekeeper is not intended to serve as a replacement for the adversary system.' " *See id* (quoting *U.S. v. 14.38 Acres of Land, More or Less, Situated in Leflore County, Mississippi,* 80 F.3d 1074, 1078 (5th Cir.1996)). *Daubert* itself acknowledged that "[v]igorous cross-examination, presentation of contrary instruction on the burden of proof" are the traditional and proper means of attacking evidence that the opponent believes to be unfounded. *Daubert*, 50 U.S. 579, 596 (1993). Moreover, "[t]he rules relating to *Daubert* issues are not precisely calibrated and must be applied in *case-specific evidentiary circumstances that often defy generalization.*" *Foreman v. Am. Rd. Lines, Inc.*, 623 F. Supp. 2d 1327, 1333 (S.D. Ala. 2008) (quoting *United States v. Brown,* 415 F.3d 1257, 1266 (11th Cir.2005)) (emphasis added). The list of *Daubert* factors is not exclusive, and district courts have wide discretion to weigh a variety of other factors. *Kumho Tire,* 526 U.S. at 150, 119 S. Ct. 1167 ("[W]e can neither rule out, nor rule

5

in, for all cases and for all time the applicability of the factors mentioned in *Daubert* . . . Too much depends upon the particular circumstances of the particular case at issue.").

Thus, the application of the *Daubert* standard should be flexible, as courts have recognized that the *Daubert* factors are only guidelines for applying Rule 702 and that "expert testimony that does not meet all or most of the *Daubert* factors may sometimes be admissible" based on the particular circumstances of the particular case. *Id.* (internal quotations omitted). Relevant here, this means that the "case-specific evidentiary circumstances" relevant to Dr. Wick's proposed testimony should be kept in mind in the course of the Court's analysis. In other words, it should be kept at the forefront that Dr. Wick has been proffered as an expert to provide testimony relevant to Plaintiff's claim for *Wentling* damages—i.e., pecuniary damages for the loss of services, attention, filial care, advice, protection, guidance, and loss of a complete family—arising from Elijah's death. *See Wentling v. Med. Anesthesia Serv., P.A.*, 237 Kan. 503, 701 P.2d 939 (1985); *Griffith v. Mt. Carmel Med. Ctr.*, 842 F. Supp. 1359, 1368 (D. Kan. 1994). The jury's task of quantifying these damages is immensely difficult. *Wentling*, 237 Kan. at 510 ("[i]t is difficult to conceive of a more subjective task than placing a dollar value on the tragic loss of a human life.") (internal quotations omitted). This is demonstrated by Defendant's recently filed Motion for Partial Summary Judgment, in which Defendant contends that Plaintiff's *Wentling* claim fails because of an alleged lack of evidence of such damages and the alleged speculative nature of the claimed damages. In her response to this Motion for Partial Summary Judgment, Plaintiff noted that *Wentling* damages are necessarily speculative to some extent simply because of the nature of the task and the difficulty of predicting future events.

This is where an educated, trained, and experienced family therapist, like Dr. Wick, comes into play. In an effort to help a jury, Plaintiff retained Dr. Wick so that she can provide an opinion

grounded in her extensive history and training as a grief and family therapist regarding Elijah's relationship with the rest of his family and the impact his death will have upon Plaintiff due to her loss of the services, attention, care, advice, protection, and guidance that Elijah provided to her. As seen below, Dr. Wick is fully qualified to serve as an expert, and considering the facts of the case and the difficulty of the task set before the jury, she meets the requirements of Fed. R. Evid 702. Consequently, Defendant's Motion to Strike should be denied.

### i. Dr. Wick's testimony would be of help to the jury.

Under Rule 702(a), an expert witness may give expert testimony if "the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue." This requirement is met here. As discussed above, the jury is going to be asked to do a near-impossible task—assigning monetary value to a human life; specifically, putting a dollar figure on the services, attention, care, advice, protection, and guidance that Elijah provided to Plaintiff or would have provided to her over the course of his life. While Dr. Wick doesn't personally suggest a number for the jury's consideration, she provides opinions on the closeness of Elijah's relationship with Plaintiff, their high-degree of dedication, encouragement, affection, and companionship, and the unusual level of support and affection that Elijah showed for his mother. The members of the jury could easily find Dr. Wick's opinions on these points to be helpful as they wrestle with the valuation of these damages.

### ii. Dr. Wick's testimony is based on adequate facts and data.

Under Rule 702(b), an expert witness may give expert testimony if the expert's "testimony is based on sufficient facts or data." Here, Defendant argues that Dr. Wick's opinions "are not based on actual knowledge, but rather are her own subjective beliefs" and further argues that Dr. Wick failed to rely on treatises, authorities, journals, or other texts. *See* Motion, Dkt. 17, at 5-6.

7

This is incorrect. Dr. Wick interviewed Plaintiff and several other persons with knowledge of Elijah and Plaintiff's relationship, and formed her opinions based on these interviews in conjunction with her extensive background as a trained and licensed family therapist. If Defendant believes that Dr. Wick's opinions lack factual support or are faulty, it should feel free to cross-examine her, introduce opposing evidence, or present some treatise or journal that undercuts her opinions. *See Daubert*, 50 U.S. 579, 596 (1993). That is the appropriate manner of minimizing the evidence presented by Dr. Wick, not a wholesale exclusion of evidence that a jury would find helpful under the circumstances.

### iii. Dr. Wick's testimony is the product of sufficiently reliable principles in her field.

Under Rule 702(b), an expert witness may give expert testimony if the expert's "testimony is the product of reliable principles and methods is based on sufficient facts or data." Defendant argues that Dr. Wick's testimony should be excluded because it has not been peer reviewed or tested and it is not similar to that of other consultants in the area. *See* Motion, Dkt. 17, at 8. The flaw with this argument is the same as the one discussed at greater length above: the jury is being asked to put value on damages that are inherently subjective and speculative. The reason there is no peer review or other consultants in this area (to Dr. Wick's knowledge) is because of the extremely narrow subject matter that is being addressed. How would one even begin to peer review or create an objective analysis of a psychological evaluation of the value of a decedent's services, attention, care, advice, protection, and guidance when the value of those services is determined by twelve members of a jury based on the specific facts and circumstances of the case before them? Dr. Wick doesn't claim to have some sort of objective testing or modeling into which she can input her measurements so that some value can be spit back out. Instead, she provides opinions based on her interviews and her training, skill, and experience regarding the decedent's

8

family structure and the impact of the decedent's loss on the services, attention, care, and companionship upon the surviving family members.

Defendant's arguments bring to mind similar ones that were made in *Foreman v. Am. Rd. Lines, Inc.*, 623 F. Supp. 2d 1327, 1334 (S.D. Ala. 2008). There, the plaintiff attacked the expert opinions of a psychologist who had conducted tests of the plaintiff and rendered opinions regarding the existence and severity of the plaintiff's alleged psychological injuries. *Id.* at 1329. The plaintiff's central argument was that the psychologist's opinions conflicted with objective psychological tests that had been conducted. *Id.* at 1333. The court rejected the plaintiff's argument, stating:

> The fundamental defect with Harris's *Daubert* argument is that it is premised on the frankly peculiar notion that clinical psychologists must give controlling, decisive weight to objective test instruments in forming clinical diagnoses and recommendations, and that the failure to do so strips a psychologist's opinions of reliability to the point that his testimony flunks a *Daubert* analysis. This contention is devoid of evidentiary or legal support. *Certainly, Harris offers no evidence that, as a matter of scientifically accepted practice, clinical psychologists confine their diagnoses and treatment recommendations to those dictated by computer-generated tests, to the exclusion of subjective tests, clinical observations, and professional judgment.* Indeed, Harris's argument would *reduce the discipline of clinical psychology to nothing more than rote recitation of standardized computer-generated profiles based on the subject's responses to stylized true-false questions. In this view of clinical psychology, patient interviews would be irrelevant and unnecessary. Subjective testing would likewise be superfluous. Exercise of clinical judgment would be impermissible*. The *reductio ad absurdum* of Harris's position is that there is no need for clinical psychologists at all, inasmuch as the MCMI and MMPI require little training to administer and Harris maintains that any exercise of professional judgment or clinical observations in interpreting those test results is scientifically unreliable to the point of violating baseline admissibility standards under the Federal Rules of Evidence. This Court is unwilling to sound the death knell for an entire field of expertise in the manner proposed by Harris.

*Id.* at 1333-34.

The same analysis is true here. Defendant apparently believes that a *Wentling* calculation must be done through spreadsheets and testing—perhaps by having Plaintiff complete a

9

questionnaire and rate the depth of her pain and loss from the death of her son on a 1-10 scale, which Dr. Wick could have then compare to similar questionnaires completed by other persons who had suffered a similar loss of a family member.  That is not how the field of psychology works, especially when attempting to weigh the depth of loss a mother has suffered from the loss of her youngest son.  Numbers and figures cannot replace the opinions of a trained psychologist derived from his or her training, skill and experience, and clinical interviews.  Similarly to the court in *Foreman*, this court should resist Defendant's request to sound the death knell for an entire field of expertise.

### iv. Dr. Wick's testimony is not unduly speculative.

Defendant's next argument is that Dr. Wick's testimony is unduly speculative in that she attempts to predict Elijah's future behavior had he lived.  *See* Motion, Dkt. 17, at 9-10.  Little more needs to be said in response to this argument than what was said in Plaintiff's response to the same argument made in Defendant's Motion for Partial Summary Judgment.  *See* Plaintiff's Response, Dkt. 20, at p. 14-15.  Suffice it to say that the Kansas Supreme Court has recognized that the calculation of these sorts of damages is always speculative to some extent.  *Wentling*, 237 Kan. at 510.  Given the inherently speculative nature of these types of damages, the appropriate question here isn't *whether* there is some level of speculation to Dr. Wick's opinions, but instead whether her clinical judgment and opinions will be of use to the jury as it attempts to complete the extremely difficult task of putting a monetary value on Plaintiff's loss of Elijah's care, attention, and companionship.

### v. Dr. Wick's testimony are appropriately grounded in the facts.

Defendant's final argument is that Dr. Wick's opinions should be excluded because they are contrary to or unsupported by the evidence.  *See* Motion, Dkt. 17, at 11-15.  In support,

Defendant points to inconsistencies or inaccuracies in Dr. Wick's deposition, such as (for example) Dr. Wick's statement that Elijah lived with Plaintiff at the time of the accident (he actually lived in Ft. Hays) and that Elijah attempted to attend Bethel College (not Ft. Hays State, as stated by Dr. Wick).

Defendant's argument is unpersuasive. The inaccuracies and inconsistencies are minor, to put it mildly, and in all probability relate more to the nearly year-long delay between Dr. Wick's interview with Plaintiff (January 2015) and the date of her deposition (January 2016). To the extent they are relevant, they should be used by Defendant in its cross-examination of Dr. Wick at trial so that a jury can assign whatever weight it believes to be appropriate as it determines Dr. Wick's credibility at trial.

## Conclusion

For the above reasons, Defendant's motion to strike Dr. Wick as an expert should be denied.

Respectfully submitted,

 s/*Jesse Tanksley*
Michael J. Wyatt (#23260)
Jesse Tanksley  (#24162)
MANN WYATT & RICE, LLC
201 E. 1st Ave.
Hutchinson, KS  67501
(620) 662-2400 (Office)
(620) 662-2443 (Fax)
MWyatt@mannwyattrice.com
JTanksley@mannwyattrice.com

*Attorneys for Plaintiff, Kristine Holmes*

11

## CERTIFICATE OF SERVICE

      The undersigned certifies that on October 13, 2016, a true and correct copy of the above and foregoing was e-mailed to:

Gerald L. Green  (#08994)
Melissa A. Moodie (#22091)
GILLILAND & HAYES, P.A.
PO Box 2977
Hutchinson, KS 67504-2977
(620)662-0537 (Office)
(620) 669-9426 (Fax)
jgreen@gh-ks.com
mmoodie@gh-ks.com

*Attorneys for Defendant Keller Krug*

                                           *s/Jesse Tanksley*